UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

BRIDGETTE W.,                                    Case No. 20-CV-0201 (PJS/BRT)

              Plaintiff,

v.                                                          ORDER

KILOLO KIJAKAZI, Acting Commissioner
of Social Security,[1]

              Defendant.

Fay E. Fishman, PETERSON & FISHMAN, for plaintiff.

Linda H. Green, SOCIAL SECURITY ADMINISTRATION, for defendant.

After the Commissioner of Social Security ("the Commissioner") terminated her

disability benefits, plaintiff Bridgette W. brought this action asking the Court to either

(1) reverse the Commissioner's decision and reinstate her benefits or (2) remand her

case to the Commissioner for another hearing.  This matter is before the Court on

Bridgette's objection to Magistrate Judge Becky R. Thorson's May 10, 2021 Report and

Recommendation ("R&R").  In that R&R, Judge Thorson recommends denying

Bridgette's motion for summary judgment and granting the Commissioner's motion for

summary judgment.  The Court has conducted a de novo review.  *See* 28 U.S.C.

---

[1]Kilolo Kijakazi has been appointed to serve as Acting Commissioner of Social
Security and therefore is automatically substituted as the defendant under Fed. R. Civ.
P. 25(d).

§ 636(b)(1); Fed. R. Civ. P. 72(b)(3).  Based on that review, the Court overrules

Bridgette's objection, adopts the R&R, and dismisses this action.

## I.  BACKGROUND

On July 27, 2009, the Social Security Administration ("SSA") found that Bridgette

was disabled as of January 1, 2008 due to her obstructive sleep apnea, restless leg

syndrome, bipolar disorder, and morbid obesity.  AR 136–39.  Bridgette was awarded

benefits, but because "[m]edical improvement [was] expected with appropriate

treatment," a continuing disability review ("CDR") was recommended.  AR 139.  Years

later, a CDR was performed, and the SSA terminated Bridgette's benefits after finding

that she was no longer disabled.  AR 168.  Bridgette unsuccessfully sought review—first

from a disability hearing officer, AR 210, and then from an administrative law judge

("ALJ"), AR 72.

As is thoroughly detailed in the ALJ's opinion and in Judge Thorson's R&R, the

ALJ followed the prescribed eight-step process in determining whether Bridgette's

medical impairments had improved to the point that she could perform substantial

gainful activity.[2]  ECF No. 31 at 3–7; *see Delph v. Astrue*, 538 F.3d 940, 945 (8th Cir. 2008);

42 U.S.C. § 423(f)(1) (outlining medical-improvement standard); 20 C.F.R.

_____

[2]Since December 1, 2017, Bridgette has had the following medical impairments: osteoarthritis, obstructive sleep apnea, obesity, superior mesenteric deep vein thrombosis, hiatal hernia, degenerative disc disease, post-traumatic stress disorder, depression, anxiety, and attention-deficit hyperactivity disorder.  AR 57–58.

§ 404.1594(b)(1) (defining medical improvement); 20 C.F.R. § 404.1594(f) (outlining

eight-step process).  The ALJ ultimately concluded that Bridgette was no longer

disabled as of December 1, 2017.  AR 71.

After the Appeals Council denied her request for review, AR 5, Bridgette sought

judicial review of the ALJ's decision, ECF No. 1.  Upon the parties' cross-motions for

summary judgment, Judge Thorson recommended granting the Commissioner's motion

and denying Bridgette's motion.  Bridgette now raises numerous objections to the R&R.

Those objections fall into three categories:  (1) the severity of Bridgette's mental-health

conditions; (2) the ALJ's citation of evidence from after December 1, 2017; and (3) the

residual functional capacity ("RFC") determination.

## II.  ANALYSIS

### A.  Severity of Mental-Health Conditions

Bridgette first objects to the ALJ's finding that her mental-health conditions are

not severe because they do not meet or medically equal the severity of an impairment

listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 59–61.  In making this finding,

the ALJ considered the four functional areas:  (1) understand, remember, or apply

information; (2) interact with others; (3) concentrate, persist, or maintain pace; and

(4) adapt or manage oneself.  AR 60–61; 20 C.F.R. Part 404, Subpart P, Appendix 1,

§ 12.00(E)(1)–(4).  The ALJ found that Bridgette had a mild limitation in each area,

meaning that her mental impairments were not severe.  AR 61.  Judge Thorson, in turn, found that the ALJ's determination was based on substantial evidence.  ECF No. 31 at 8. Bridgette now raises a series of objections to this conclusion.

### 1.  Functional-Area Analysis

Bridgette asserts that the ALJ's functional-area analysis was faulty for failing to consider certain medical records, mischaracterizing her daily activities, and cherry picking the record.  At bottom, Bridgette is simply asking the Court to reweigh the evidence and perform its own functional-area analysis, which the Court cannot do. *Mabry v. Colvin*, 815 F.3d 386, 389 (8th Cir. 2016).  As Judge Thorson explained, judicial review of an ALJ's decision "is limited to determining whether the [ALJ's] findings are supported by substantial evidence."  *Delph*, 538 F.3d at 945.  Having reviewed the record, the Court agrees with Judge Thorson that the ALJ's functional-area analysis was supported by substantial evidence.

As to Bridgette's specific objections:

*Contents of Medical Records.*  Bridgette first argues that the ALJ overlooked adult rehabilitative mental health services ("ARMHS") records and personal care assistant ("PCA") records that show that Bridgette received incomplete grades in her associate's degree program in paralegal studies and that provide evidence of Bridgette's struggles with insomnia, hypersomnia, stress, racing thoughts, lack of focus, verbal

aggressiveness, personal hygiene, and inappropriate behavior.  ECF No. 33 at 2.  But

"an ALJ is not required to discuss all the evidence submitted," and the failure of an ALJ

to discuss the contents of a record "does not indicate that it was not considered."  *Craig*

*v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000).  Here, the ALJ cited the ARMHS and PCA

records—so he obviously reviewed them—and he discussed Bridgette's mental-health

symptoms with reference to other medical records.  *See* AR 58–61, 68–69.  Bridgette fails

to explain why the fact that the ALJ cited certain records but not others in his discussion

of her mental health means that the ALJ's decision was not supported by substantial

evidence.  At most, then, Bridgette has identified a deficiency in the ALJ's "opinion-

writing technique," which does not warrant remand.  *See Johnson v. Apfel*, 240 F.3d 1145,

1149 (8th Cir. 2001).

　　*ARMHS Level.*  Bridgette also objects to the ALJ's characterization of her ARMHS

level.  The ALJ stated that Bridgette "received low intensity community based ARMHS

services" from 2015 to October 2017.  AR 59.  The ALJ was mostly, but not entirely,

correct.  Bridgette did indeed receive low-intensity services until July 2017, AR 1655,

1662, 1671, but at that point her service level increased to high intensity, AR 1798.

Although the ALJ did not discuss this increase, his omission was harmless.  Just two

months after Bridgette's ARMHS level increased, her progress notes state that "she was

thinking of graduating from ARMHS," AR 1781—that is, electing to receive *no* services

from ARMHS.  And subsequent medical records indicate that Bridgette was able to

manage her mental-health conditions with medication.  AR 1940–41, 2097–107; *see*

*Cronin v. Saul*, 945 F.3d 1062, 1068 (8th Cir. 2019) ("Conditions that are controlled with

treatment are not considered disabling.").  Nothing about the service-level increase

undercuts the ALJ's ultimate conclusion that Bridgette's mental-health conditions are

not severe, and thus the ALJ's error was harmless.  *See Byes v. Astrue*, 687 F.3d 913, 917

(8th Cir. 2012) (error is harmless when ALJ would not decide "differently if the error

had not occurred").

    *Contempt of Court.*  In evaluating the second functional area, the ALJ mentioned

that Bridgette represented herself in out-of-state child-support proceedings.  AR 60; *see*

*also* AR 1645, 1779, 1781.  Bridgette notes that the ALJ failed to mention her "Contempt

of Court citation."  ECF No. 33 at 4; AR 2102 (noting contempt citation for talking out of

turn).  But the contempt citation alone does not undercut the ALJ's finding regarding

the second functional area.  To the contrary, substantial evidence supports the ALJ's

conclusion that Bridgette's ability to interact with others is only mildly limited.  *See, e.g.,*

AR 553, 598, 609–10, 1650, 1652, 1659, 1664, 2029.  Thus, any error in failing to mention

the contempt citation was harmless.  *See Byes*, 687 F.3d at 917.

    *Internship.*  Bridgette next asserts that the ALJ mischaracterized her internship at

Legal Assistance of Dakota County.  The ALJ mentioned the internship when assigning

mild limitations in the first, second, and fourth functional areas, while also noting that

"[s]ome slowed learning was reported."  AR 60–61.  Bridgette argues that she received a

"poor evaluation," so the ALJ's description of the internship was inaccurate.  ECF

No. 33 at 4.  The Court disagrees.  Bridgette's quality of work was rated as "average,"

and she received a letter grade of "C" (or "good overall").  AR 555.  True, Bridgette was

sometimes slow to learn and sometimes neglectful or careless, she required

"significant" supervision for new tasks, and she had irregular attendance and

punctuality.  AR 553–55.  But she also worked "well with others," usually exercised

good judgment, was "[v]ery willing" to take directions, was "[o]utstanding in

enthusiasm," and would "really excel" with a "consistent schedule" and "significant

supervision."  AR 553–56.  The ALJ therefore did not err in describing or relying on the

internship.[3]

   In sum, any "deficienc[ies] in the ALJ's characterization of [Bridgette's] mental-

health treatment and daily activities" in the course of his functional-area analysis do

"not require the [C]ourt to set aside the ALJ's findings that are supported by substantial

evidence."  *Fritzke v. Colvin*, No. 14-CV-0025 (JJK), 2015 WL 12781200, at *13 (D. Minn.

Mar. 2, 2015).  And because resolving these purported shortcomings in Bridgette's favor

---

[3]Bridgette's objection also cites to her brief, which asserts that the ALJ failed to discuss her anger and irritability, incomplete grades, school accommodations, difficulties focusing, hygiene issues, and emotional distress.  But the ALJ *did* discuss those issues in a manner consistent with the record.  *See* AR 59–61.

would not materially undermine the ALJ's ultimate evaluation of the functional areas, any errors were harmless. *See Byes*, 687 F.3d at 917; *see also Buford v. Colvin*, 824 F.3d 793, 795 (8th Cir. 2016) (noting a court "will not reverse simply because some evidence supports a" different conclusion). The Court therefore rejects Bridgette's objections to the functional-area analysis.

### 2. Opinions of the State-Agency Doctors

In his analysis of Bridgette's mental-health conditions, the ALJ relied on two state-agency doctors—Mera Kachgal, Ph.D., and Ray Conroe, Ph.D.—who both opined that Bridgette's mental-health conditions were not severe. AR 159, 2074. An ALJ may rely on state-agency doctors' opinions if they are "consistent with the other medical evidence." *Mabry*, 815 F.3d at 391. Bridgette identifies two errors in the opinions of the state-agency doctors.

First, the state-agency doctors noted that Bridgette was pursuing a master's degree, AR 158, 2075, when in fact she had an associate's degree and was pursuing a bachelor's degree, AR 88. But this error did not have an impact on either doctor's opinion or on the ALJ's ultimate findings—particularly because the ALJ did not repeat the doctors' mistake. *See* AR 60; *White v. Colvin*, No. 2:13-cv-609-FtM-CM, 2015 WL 247988, at *4 (M.D. Fla. Jan. 20, 2015) (no error in relying on opinion of state-agency doctor that incorrectly stated that plaintiff did not take psychiatric medications, because

ALJ acknowledged the medications).  Second, Bridgette asserts that the state-agency

doctors selectively cited records and failed to link her symptoms to their findings.  The

Court disagrees.  As Judge Thorson explained, the opinions thoroughly detailed

Bridgette's medical records and symptoms.  ECF No. 31 at 10; AR 153–55, 2075–76.  But

even if Bridgette is correct, the ALJ did not rely solely on the state-agency doctors'

opinions when analyzing the functional areas, and substantial evidence supports his

functional-area findings.  *See Stormo v. Barnhart*, 377 F.3d 801, 808 (8th Cir. 2004) (no

error in relying on unreliable results from neuropsychology tests when ALJ also relied

on "numerous" other sources in evaluating functional areas).

### 3.  Consultative Examination

Bridgette contends that the ALJ should have ordered a consultative examination.

But an "ALJ's duty to develop the record is not never-ending," *Buford*, 824 F.3d at 797,

and a consultative examination is not required unless the medical records fail to

provide sufficient evidence to determine whether the individual is disabled, *McCoy v.

Astrue*, 648 F.3d 605, 612 (8th Cir. 2011).  Since the ALJ's determination that Bridgette's

mental-health conditions were not severe was supported by substantial evidence, a

consultative examination was not required.  *See Swink v. Saul*, 931 F.3d 765, 770 (8th Cir.

2019).

### B.  Evidence After the Cessation Date

Bridgette objects to the fact that, in deciding that she was no longer disabled as of December 1, 2017, the ALJ cited evidence that was created after December 1, 2017.  The SSA has made clear, however, that when an adjudicator reviews a determination "that disability has medically ceased, the adjudicator must consider the individual's disability through the date of his or her determination or decision, rather than determining only whether the individual's disability had ceased at the time of the initial cessation determination."  SSR 13-3P, 2013 WL 785484, at *3 (Feb. 21, 2013).  The ALJ therefore did not err in citing evidence from after December 2017.  *See Sabljakovic v. Saul*, No. 4:20-cv-00012-AGF, 2021 WL 778895, at *5 (E.D. Mo. Mar. 1, 2021).

Bridgette next argues that, even if the ALJ can consider medical evidence from after December 2017, the ALJ failed to consider *all* of that evidence.  Specifically, Bridgette says that the ALJ overlooked records at AR 1940–42 and AR 2004–10, and that those records provide evidence of problems she has experienced with her CPAP machine, fatigue, mental health, irritation, anxiety, focusing, stress, social withdrawal, crying spells, loss of interest, racing thoughts, and incomplete grades.  Bridgette is incorrect; the ALJ cited the specific records that she says he overlooked.  AR 59.  And even if he had not cited those records, the fact that an ALJ did not cite a record does not mean that the ALJ did not review the record.  *Craig*, 212 F.3d at 436.  Moreover, the ALJ's analysis of Bridgette's symptoms is entirely consistent with the records that she

-10-

claims he overlooked.  *See* AR 63–64 (addressing CPAP use and fatigue in 2017 and 2018); AR 59 (discussing mental-health symptoms in 2017 and 2018).  The ALJ did not err.

### C.  Residual Functional Capacity

Bridgette's final set of objections pertain to the ALJ's RFC determination.  "The RFC describe[s] what [Bridgette] is able to do despite limitations caused by all of [her] impairments."  *Kraus v. Saul*, 988 F.3d 1019, 1022 (8th Cir. 2021) (citation and quotation marks omitted); *see also* 20 C.F.R. § 404.1545(a)(1).  The ALJ "must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations."  *McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir. 2003) (citation and quotation marks omitted).  Here, the ALJ found that as of December 1, 2017, Bridgette could perform sedentary work, "except no work around unprotected heights or contaminated atmosphere with pulmonary irritants or in extreme cold; occasional pushing and pulling; occasional use of ramps and stairs and no use of ladders, ropes or scaffolds."  AR 65.  Judge Thorson found that this RFC was supported by substantial evidence.  Bridgette disagrees and makes several complaints about the RFC determination.

1.  Medical Expert's Opinion

Bridgette first contends that the ALJ erred in giving considerable weight to the opinion of expert witness Dr. Steven Golub, because (she claims) Dr. Golub made errors in his testimony about Bridgette's ankle and back.  This argument is a nonstarter.  As Judge Thorson explained, the ALJ did not rely solely on Dr. Golub's testimony in developing the RFC.  Instead, the ALJ cited many medical records related to Bridgette's ankle and back, noted the absence of treatment (aside from pain medication) for problems with her ankle and back after January 2018, and concluded that a sedentary RFC was appropriate.  AR 67–68; *see Buford*, 824 F.3d at 797 (limited course of treatment supports ALJ's RFC determination); *Wildman v. Astrue*, 596 F.3d 959, 965 (8th Cir. 2010) (impairments controlled by treatment or medication are not disabling).  As a result, any error in Dr. Golub's testimony was harmless.  More importantly, though, the Court does not agree that Dr. Golub made errors.

*Ankle.*  Dr. Golub testified that a January 2018 MRI of Bridgette's left ankle showed "chronic changes, osteoarthritis and evidence of a chronic sprain."  AR 103.  Bridgette asserts that Dr. Golub failed to mention the "chronic ununited fracture of the distal tip of the lateral malleolus" that was identified in an MRI.  AR 2048.  But Dr. Golub mentioned "chronic changes," which could include the "chronic ununited fracture."  In any event, the failure of a medical expert to mention a medical condition is

-12-

irrelevant to an RFC determination unless the overlooked condition "causes functional limitations." *Cf. Martin v. Astrue*, No. 09-CV-1998 (RHK/JJG), 2010 WL 2787437, at *6 (D. Minn. June 7, 2010), *R&R adopted*, 2010 WL 2787435 (D. Minn. July 14, 2010). Bridgette has not identified additional functional limitations stemming from the chronic ununited fracture that were not encompassed by the sedentary RFC.  And, most importantly, the ALJ specifically mentioned the fracture and cited corresponding medical records when developing the RFC, demonstrating that he took this condition into account when crafting the RFC.  AR 67.

*Back.*  Bridgette argues that Dr. Golub "failed to note the extensive findings" in her mid and low back.  ECF No. 33 at 5.  Dr. Golub testified that a January 2018 MRI of Bridgette's lumbar spine "showed degenerative disc disease, no significant stenosis, no nerve root impingement, also some arthritis."  AR 103.  His testimony appears to be consistent with the MRI results, *see* AR 2018, 2051, and Bridgette does not explain what omitted "findings" would change Dr. Golub's opinion about her exertion level or the ALJ's determination of her RFC.  Accordingly, the Court rejects this objection.

## 2.  Postural and Manipulative Limitations

Bridgette next objects to the ALJ's failure to include postural and manipulative limitations in the RFC.[4]  Postural limitations were recommended by Dr. Golub, a state-

---

[4]"Postural limitations include climbing, balancing, stooping, kneeling, crouching, (continued...)

agency doctor (Dr. Paul Ossmann), and Bridgette's treating physician (Dr. Suzanne Davidowitz), while manipulative limitations were recommended by Dr. Golub and Dr. Davidowitz.  *See* AR 104 (Dr. Golub, opining "manipulative functions would be done occasionally; pushing and pulling would be occasional and reaching overhead could be done frequently . . . stairs and ramps occasionally, no ladders or scaffolds and the other postural activities on [an] occasional basis"); AR 162 (Dr. Ossmann, recommending occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; never climbing ladders/ropes/scaffolds; and no manipulative limitations); AR 2133 (Dr. Davidowitz, recommending manipulative limitations; occasional bending, squatting, reaching, and kneeling; and no crawling or climbing); *see also* AR 2079 (state-agency consultant Dr. Gregory Salmi, stating "a sedentary RFC remains appropriate").

Judge Thorson found the ALJ's reasoning for excluding these limitations to be adequately supported.  ECF No. 31 at 16–17.  Again, the Court agrees.

*Postural Limitations.*  The ALJ excluded postural limitations because they were not supported by the record, noting that "the MRI studies showed no significant

_____

[4](...continued)
and crawling."  *Bandy v. Shalala*, 16 F.3d 1227, at *2 n.3 (8th Cir. 1994) (per curiam) (unpublished table decision).  Manipulative limitations include "reaching, handling, fingering, [and] feeling."  *Batta v. Astrue*, No. 11-CV-0293 (SRN/LIB), 2012 WL 956512, at *3 (D. Minn. Jan. 31, 2012), *R&R adopted*, 2012 WL 956506 (D. Minn. Mar. 21, 2012).

stenosis or nerve impingement" and also noting that there was "limited pain management . . . since December 2017." AR 69. Although some of the doctors recommended postural limitations, an ALJ can properly reject a doctor's opinion when it is "inconsistent with the medical record as a whole." *Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995). Given that postural limitations were not "not based on all relevant medical evidence," the ALJ did not err in declining to include them. *McCoy*, 648 F.3d at 615.

But even if the ALJ should have included postural limitations, his failure to do so does not fatally undermine his RFC determination—specifically, his determination that Bridgette is capable of performing sedentary work (with certain limitations). AR 67–68. Sedentary work accommodates "postural limitations because it involves minimal standing and lifting and may be performed primarily from a seated position." *Thompson v. Astrue*, 226 F. App'x 617, 621 (8th Cir. 2007) (per curiam). Indeed, "balancing, kneeling, crouching, or crawling . . . are not usually required in sedentary work," though occasional stooping is "required in most unskilled sedentary occupations." SSR 96-9p, 1996 WL 374185, at *7–8 (July 2, 1996). Dr. Davidowitz opined that Bridgette could occasionally bend (or stoop[5]), squat, reach, and kneel, but that she

---

[5]Stooping is a "type[] of bending." SSR 83-14, 1983-1991 Soc. Sec. Rep. Serv. 41, at *2 (Jan. 1, 1983).

could not climb or crawl.  AR 2133.  In effect, then, the sedentary RFC fully incorporates

Dr. Davidowitz's proposed postural limitations.[6]

It follows that failing to include the postural limitations was, at worst, harmless

error.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008) (excluding

postural limitations "was harmless since sedentary jobs require infrequent stooping,

balancing, crouching, or climbing"); *Reinholtz v. Colvin*, No. 13-2174, 2014 WL 7148608,

at *5 (W.D. Ark. Dec. 15, 2014) (concluding "RFC of sedentary work was consistent

with" postural limitations); *Asher v. Astrue*, No. 11-3166, 2012 WL 287394, at *2 (W.D.

Mo. Jan. 31, 2012) (excluding postural limitations was harmless error because it "would

not have changed the ALJ's determination that Plaintiff could return to his past work").

*Manipulative Limitations*.  The ALJ declined to include the manipulative

limitations proposed by Dr. Davidowitz and Dr. Golub because they were inconsistent

with the record.  As Judge Thorson explained, Bridgette reported on multiple occasions

that she did not have difficulty using her hands or fingers or any issues with handgrip.

ECF No. 31 at 17 (citing AR 580, 590, 599, 669); *see also* AR 1760.  Dr. Golub testified that

Bridgette was not being treated for carpal tunnel syndrome.  AR 103.  And Dr. Ossmann

did not recommend manipulative limitations.  AR 162.  Because the recommended

---

[6]In addition, the vocational expert testified that Bridgette could perform her past
relevant work as a receptionist, a position that also incorporates the postural limitations.
AR 105; *Receptionist*, Dictionary of Occupational Titles, 237.367-038 (4th ed. 1991)
(noting no climbing, balancing, stooping, kneeling, crouching, or crawling).

manipulative limitations were not supported by the record, the ALJ did not err in

failing to include them in the RFC.  *See McGeorge*, 321 F.3d at 769 ("The ALJ properly

limited his RFC determination to only the impairments and limitations he found to be

credible based on his evaluation of the entire record.").

### 3.  Treating Physician's Opinion

Bridgette next argues that the ALJ should have given more weight to the opinion

of her treating physician, Dr. Davidowitz.  Generally, an ALJ "must give controlling

weight to a treating physician's opinion if it is well-supported by medically acceptable

clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence."  *Kraus*, 988 F.3d at 1024 (citation and quotation marks omitted);

*see also* 20 C.F.R. § 404.1527(c)(2).[7]  "A treating physician's opinion does not

---

[7]The evaluation of medical opinions for claims filed before March 27, 2017 is
governed by 20 C.F.R. § 404.1527, while 20 C.F.R. § 404.1520c governs the evaluation of
medical opinions for claims filed on or after that date.  The SSA uses "the current rules
in all CDRs" unless:  (1) it is "the first CDR for the claim(s) after March 27, 2017," *and*
(2) there "is no medical improvement related to the ability to work," *and* (3) "[a]ll full
medical determination(s) made in the claim(s) under review were made using the prior
rules."  SSA, Program Operations Manual System, DI 24503.050 Determining the Filing
Date for Evaluating Evidence, TN 3 (02-19) (Apr. 3, 2017),
https://secure.ssa.gov/poms.Nsf/lnx/0424503050.  Since the ALJ found medical
improvement related to Bridgette's ability to work, AR 64, the current rule applies.  *See*
*Bobo v. Saul*, No. 4:19-CV-199 PLC, 2021 WL 2665907, at *5 n.5 (E.D. Mo. June 29, 2021).

The ALJ stated that he "considered opinion evidence in accordance with the
requirements of 20 CFR 404.1527," indicating that he applied the old rule.  AR 65.
Curiously, the ALJ went on to essentially quote § 404.1520c(a), writing that he would
(continued...)

-17-

automatically control," though, because "the record must be evaluated as a whole."

*Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (citation and quotation marks

omitted).  Therefore, an "ALJ may discount or even disregard the opinion of a treating

physician where other medical assessments are supported by better or more thorough

medical evidence, or where a treating physician renders inconsistent opinions that

undermine the credibility of such opinions."  *Id.* at 897–98 (citation and quotation marks

omitted).

---

[7](...continued)
not "give any specific evidentiary weight" to any medical opinion.  AR 69.  But in the
very next sentence, the ALJ gave weight to a medical opinion.  AR 69.  As a result, it
appears that the ALJ erroneously followed § 404.1527.  However, neither party objected
to this error:  Bridgette (incorrectly) argues that § 404.1527 *should* apply, ECF No. 24
at 35–36, while the Commissioner cited the old rule without discussion, ECF No. 29
at 13.  Judge Thorson also cited the old rule, ECF No. 31 at 17, and neither party
objected to her doing so.

The Court will apply the old rule because neither party has objected to its
application and because any error in applying it would be harmless, given that the old
rule is more deferential to treating physicians, and thus applying it *helps* Bridgette.  *See*
*Burba v. Comm'r of Soc. Sec.*, No. 1:19-CV-905, 2020 WL 5792621, at *4 (N.D. Ohio
Sept. 29, 2020) ("[T]he new regulation is supposed to make it easier for ALJs to discount
treating physician opinions.").  Moreover, the Court cannot identify any determination
of the ALJ that would have changed if he had applied the new rule.  *See Byes*, 687 F.3d
at 917; *Patricia A. v. Saul*, No. 3:18-CV-01884-MO, 2019 WL 6107846, at *5 (D. Or.
Nov. 14, 2019) (declining to remand based on ALJ's erroneous application of old
regulation because plaintiff did not object and differences between the two regulations
"are not consequential in determining whether the ALJ erred in evaluating the medical
opinion evidence").

For four reasons, the Court agrees with Judge Thorson's conclusion that the ALJ did not err in failing to give greater weight to Dr. Davidowitz's opinion.  First, Dr. Davidowitz was merely one of many medical providers who treated Bridgette; this is not a case in which a claimant received most of her medical care from a single provider.  *See* § 404.1527(c)(2)(i) (frequency of care).  Second, Dr. Davidowitz's opinion was based largely on Bridgette's discredited subjective reports.  *See Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017) (ALJ can give less weight to treating-physician opinion based on non-credible subjective complaints).  Third, much of Dr. Davidowtiz's "opinion" takes the form of checking boxes on a form without elaboration or explanation.  AR 2133; *see Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (checkbox forms have "little evidentiary value"); *Belinda B. v. Saul*, No. 20-CV-0488 (JRT/LIB), 2021 WL 537932, at *8 (D. Minn. Jan. 28, 2021) (giving less weight to opinion consisting of vague statements, checked boxes, fill-in-the-blanks, and few references to medical records), *R&R adopted sub nom. Beebe v. Saul*, 2021 WL 533689 (D. Minn. Feb. 12, 2021).

And finally, Dr. Davidowitz's opinion was contradicted by other medical records and opinions.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1064–65 (8th Cir. 2012) (discounting treating physician's opinion was appropriate when it contradicted other medical experts' opinions); *Partee v. Astrue*, 638 F.3d 860, 864 (8th Cir. 2011) (giving less weight to treating physician's opinion was "reasonable" when the opinion "contradicted other

-19-

objective evidence in the record").  For example, Dr. Davidowitz opined that Bridgette

would need to lie down during the work day, AR 2132—a restriction that is not

supported by any evidence in the record, AR 70.  In addition, Dr. Davidowitz

recommended manipulative restrictions, AR 2133, even though Bridgette reported

having no difficulties with her hands and fingers, AR 580, 590, 599, 669, and even

though Bridgette was not being treated for carpal tunnel syndrome, AR 103.  For these

reasons, the ALJ did not err in affording only "partial weight" to Dr. Davidowitz's

opinion.  AR 70.[8]

Bridgette next asserts that the ALJ was biased against Dr. Davidowitz because he

scrutinized her opinions more closely than the opinions of the state-agency doctors.

The Court rejects this contention.  *See Partee*, 638 F.3d at 865 (rejecting claim without

evidence that ALJ was biased against treating physician).  Just as the ALJ discounted

parts of Dr. Davidowitz's opinion that were not supported by the medical records, the

ALJ also discounted unsupported aspects of the state-agency doctors' opinions.

---

[8]Bridgette notes that the ALJ failed to mention that Dr. Davidowitz had treated
Bridgette for three years.  Under 20 C.F.R. § 404.1527(c)(2)(i) an ALJ must consider the
"[l]ength of the treatment relationship," but nothing requires the ALJ to explicitly
mention this factor in his opinion.  *See Krick v. Berryhill*, No. 16-CV-3782-KMM, 2018 WL
1392400, at *7 n.13 (D. Minn. Mar. 19, 2018) (no error when ALJ failed to mention that
treating physician had treated claimant since 2006).

4.  Improper Opinion

Bridgette argues that the ALJ improperly substituted his own opinion for

medical evidence in developing the RFC.  Although "the RFC determination is a

'medical question,' that 'must be supported by some medical evidence,'" that

determination is still "reserved to the agency such that it is neither delegated to medical

professionals nor determined exclusively based on the contents of medical records."

*Noerper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020).  As a result, the RFC finding need not

"be supported by a specific medical opinion."  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th

Cir. 2016).  In this case, "[t]he ALJ incorporated the doctors' various tests and analyses

into a determination of [Bridgette's] RFC.  The ALJ appropriately disregarded the

unsupported conclusory elements."  *Kraus*, 988 F.3d at 1025.  The Court rejects

Bridgette's argument.

5.  Bridgette's Subjective Reports

Finally, Bridgette argues that the ALJ should have fully credited her subjective

reports about her symptoms.[9]  An "ALJ may disbelieve a claimant's subjective reports

---

[9]Bridgette reiterates her argument that the ALJ misconstrued her internship; the
Court has already rejected this claim.  Bridgette argues that the ALJ failed to consider
the "quality, frequency, and independence" of her daily activities, because he did not
discuss her school accommodations, PCA, and family members' PCAs.  ECF No 33 at 8.
This is incorrect.  AR 60–61, 69.  Bridgette asserts that both the ALJ and Judge Thorson
erred when they noted that the Social Security investigator observed her walking
without "assistive devices," AR 68, 609; ECF No. 31 at 21, because Bridgette was not

(continued...)

of pain because of inherent inconsistencies or other circumstances," *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004), such as "when he explicitly finds them inconsistent with daily activities, lack of treatment, demeanor, and objective medical evidence," *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996).  Bridgette takes issue with the ALJ's consideration of her daily activities, arguing that an individual need not be "bedridden" to be disabled.  ECF No. 33 at 8 (quoting *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989)).  That is true, of course, but it is also true that the Eighth Circuit has routinely found that daily activities akin to Bridgette's[10] undermine reports of disabling pain.  *See, e.g.*, *Wright v. Colvin*, 789 F.3d 847, 854 (8th Cir. 2015) (driving, shopping, bathing, and cooking); *Renstrom*, 680 F.3d at 1067 (vacations, daily chores, providing self-care); *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) (cooking, vacuuming,

---

[9](...continued)
prescribed a walker until after the investigation.  True, Bridgette was not prescribed a walker until after the investigation occurred, but Bridgette self-reported *before* the investigation that she was given splints or braces for her legs and was told to use a wheelchair when she was in pain (i.e., "assistive devices").  AR 570, 600.  The ALJ's opinion and Judge Thorson's R&R were therefore accurate.

[10]The ALJ noted that Bridgette:  lives in a three-story town home, AR 181, 1654; makes her appointments, AR 1795; uses social media, AR 626–40; travels out of state for vacations, legal proceedings, and conferences, AR 181, 639, 1670, 2063; shops online and in-person, manages the household money, and pays the bills, AR 182, 597; goes to the beauty shop, AR 592; eats out, AR 596; drives, AR 597; attends school, AR 88, 617–25; was observed walking without ambulatory aids or gait difficulty, AR 609; went to a shooting range, AR 640; and attends church, AR 2404.  *See* AR 69.

washing dishes, doing laundry, shopping, driving, and walking).  The ALJ's

consideration of Bridgette's daily activities was proper.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

the Court OVERRULES plaintiff's objection [ECF No. 33] and ADOPTS the R&R [ECF

No. 31].  IT IS HEREBY ORDERED THAT:

1.    Plaintiff's motion for summary judgment [ECF No. 23] is DENIED.

2.    Defendant's motion for summary judgment [ECF No. 28] is GRANTED.

3.    Plaintiff's complaint [ECF No. 1] is DISMISSED WITH PREJUDICE AND

       ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 29, 2021                              s/Patrick J. Schiltz
                                                              Patrick J. Schiltz
                                                              United States District Judge